**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Steven L. Wittels
Ethan D. Roman
305 BROADWAY, FLOOR 7
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com
slw@wittelslaw.com
edr@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDRES TITUS & WILLIAM MCLEAN, p/k/a "BLACK SHEEP," Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>UMG RECORDINGS, INC.,<br><br>Defendant. | Civil Case No. 23 Civ. 15<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Andres Titus and William McLean ("Plaintiffs"), by their attorneys Wittels McInturff Palikovic, bring this action individually and on behalf of a class of persons defined below, against Defendant UMG Recordings, Inc. ("Defendant," "Universal," "UMG," or the "Company") and allege the following with knowledge as their own acts, and upon information and belief, as to all other acts:

**OVERVIEW OF UNIVERSAL'S UNLAWFUL CONDUCT**

1.     Universal is the largest record label in the world.  In Universal's standardized recording contract, artists assign the copyright in their sound recordings to Universal in exchange

for royalty payments.  Universal then markets and distributes these recordings and is contractually required to account to its artists for royalties owed.

2.     This class action lawsuit seeks to remedy Universal's breach of its standardized contract and bad faith conduct that is depriving artists of the royalties they are contractually owed. Specifically, Universal is withholding hundreds of millions of dollars in royalties from artists through a previously undisclosed arrangement whereby Universal licensed artists' recordings to the Spotify music streaming service in exchange for Spotify stock and lower royalty payments. Under this arrangement, instead of paying artists their full royalty payments, Universal made smaller payments and held onto the Spotify stock that contractually belongs to Universal's artists.

3.     As set forth herein, Universal's standardized contract with Plaintiffs and the Class grants Defendant the right to monetize artists' works in exchange for, among other things, royalties to artists set at 50% of Universal's "net receipts" with respect to "any use or exploitation(s)" of the "Master Recordings" created by artists.  In the mid-2000s, Universal struck an undisclosed, sweetheart deal with Spotify whereby Universal agreed to accept substantially lower royalty payments on artists' behalf in exchange for equity stake in Spotify—then a fledgling streaming service.  Yet rather than distribute to artists their 50% of Spotify stock or pay artists their true and accurate royalty payments, for years Universal shortchanged artists and deprived Plaintiffs and Class Members of the full royalty payments they were owed under Universal's contract.

4.     Moreover, Universal concealed from artists that it acquired Spotify stock and that royalty payments were depressed as a result.  Over time, the value of the Spotify stock that Universal improperly withheld from artists has ballooned to hundreds of millions of dollars.  These and the other wrongful conduct detailed herein resulted in the Company's breaching its contracts with artists, violating the covenant of good faith and fair dealing that is implicit in those contracts, and unjust enrichment at the expense of its artists.

5.      Plaintiffs and the Class defined below have been injured by Universal's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, and declaratory and injunctive relief for Universal's breach of contract, breach of the duty of good faith and fair dealing, and its unjust enrichment at the expense of Plaintiffs and the Class.

6.      Only through a class action can Universal's artists remedy Defendant's ongoing wrongdoing.  Because the damages suffered by each Universal artist are small compared to the much higher cost a single Universal artist would incur in trying to challenge Universal's unlawful practices, it is not financially feasible for an individual artist to bring his or her own lawsuit. Further, many Universal artists do not realize they are victims of Universal's unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and ensure that companies like Universal engage in fair and upright business practices.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

7.      This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and the Defendant.

### Personal Jurisdiction

8.      This Court has specific personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in this jurisdiction, including maintaining offices in this jurisdiction, and conducts advertising, marketing, and distribution of recordings in this jurisdiction.  Defendant also engages in continuous and systematic business activities in this District.

*Venue*

9.      Venue is proper in this District pursuant to 28 U.S.C § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District and Defendant maintains its headquarters in Manhattan.  Venue is also proper in this District pursuant to the contract Plaintiffs entered into with Polygram Records, Inc. ("Polygram"), for which Defendant is the successor-in-interest.  Plaintiffs' contract also requires that any litigation arising from the contract be brought in the State and County of New York.

## PARTIES

10.     Plaintiff Andres Titus is an individual residing in Queens, New York.  Plaintiff Titus is a member of the rap duo "Black Sheep."  Plaintiff Titus signed a contract with Polygram, for which Universal is the successor-in-interest, in approximately July 1990.  The contract between Plaintiff and Polygram permits the record label to monetize Black Sheep recordings in exchange for royalty payments.

11.     Plaintiff William McLean is an individual residing in Orlando, Florida.  Plaintiff McLean is a member of the rap duo "Black Sheep."  Plaintiff McLean signed a contract with Polygram, for which Universal is the successor-in-interest, in approximately July 1990.  The contract between Plaintiff and Polygram permits the record label to monetize Black Sheep recordings in exchange for royalty payments.

12.     Defendant UMG Recordings, Inc. is an American global music corporation organized under Delaware law, with its principal place of business and global corporate headquarters located in Santa Monica, California.  It is also known as and does business interchangeably as "UMG" and "Universal Music Group."  UMG also maintains U.S. headquarters at 1755 Broadway, New York, New York.  On information and belief, UMG Recordings, Inc. is the entity responsible for the conduct described herein and is the proper Defendant in this action.  If discovery demonstrates

that there are other UMG entities that are also responsible and/or liable for the conduct challenged in this litigation, Plaintiffs will amend their complaint and name those additional entities as defendants in this action.

13.     Universal uses the trade names "UMG" and "Universal Music Group" for its various corporate music-based operations.  It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including Polygram, Chrysalis, A & M, Capitol, EMI, Motown, Def Jam, Geffen, and the other companies which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring, or operation of law.

14.     At all relevant times Universal was and is responsible for the accounting and payment decisions and practices for royalties owed to Plaintiffs and the Class who contracted with any of UMG's affiliated labels.  UMG determines the manner in which the royalties at issue in this action are accounted for and paid, including its practice of failing to pay Plaintiffs and the Class 50% of net receipts as owed under the relevant contracts.  UMG and its royalty and accounting departments generate the royalty statements to Plaintiffs and the Class and are responsible for the systematic underpayment of royalties.  UMG is also the recipient of the funds obtained from the practices challenged in this lawsuit.

15.     Universal staffs a royalty department in this judicial district and maintains a database of each contractual royalty recipient, by name and address, along with data about the percentage of net receipts each royalty recipient receives for licenses.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs Titus and McLean Found Black Sheep and Record Hit Albums

16.     Plaintiffs are professionally known as hip hop duo "Black Sheep."  Black Sheep's debut album, *A Wolf in Sheep's Clothing*, was released in 1991 by the then-Polygram label Mercury Records.  *A Wolf in Sheep's Clothing* was certified Gold by the Recording Industry

Association of America, meaning it sold more than 500,000 copies.  *A Wolf in Sheep's Clothing* reached number 30 on the Billboard 200 chart.

17.   Black Sheep is perhaps best known for their hit single *The Choice Is Yours (Revisited)*, released in 1991 on *A Wolf in Sheep's Clothing*.  *The Choice Is Yours (Revisited)* reached Number 1 on Billboard's U.S. Hot Rap Singles Chart.  *The Choice Is Yours (Revisited)* was ranked number 73 on the 100 Greatest Hip Hop Songs of all time, and in recent years has been featured in major motion pictures including *Spider-Man: Into the Spider-Verse* (2018) and played in commercials for Papa John's pizza.

18.   Black Sheep's follow up album, *Non-Fiction*, was released in 1994 and reached number 107 on the Billboard 200 chart.

19.   Plaintiffs Titus' and McLean's contract with Polygram governs the sale and distribution of their music, including recordings by Black Sheep.  This contract was amended and revised in July 1991.  A copy of the July 1991 contract is attached hereto as **Exhibit A**.  In 1998, Universal and Polygram merged, with the new entity Universal Music Group assuming the contract.

## II.   Universal's Music Business, Its Deal to Acquire Spotify Equity, and the Resulting Artificially Depressed Royalty Payments

20.   According to a prospectus the Company filed on September 14, 2021, Universal "owns more than 50 labels covering all music genres."[1]  UMG's "major record labels and labels groups include Capitol Music Group, Interscope Geffen A&M, Republic Records,[2] Island Records,

---

[1]   Universal Music Group N.V. Prospectus, Sept. 14, 2021 ("Prospectus"), at F-14, F-69, https://www.vivendi.com/wp-content/uploads/2021/09/Universal-Music-Group-Prospectus-14-September-2021.pdf (last visited Jan. 4, 2023).

[2]   Mercury Records, the label Plaintiffs released their albums under, now operates as an extension of Republic Records, a label imprint owned by Universal Music Group.   Republic Records, https://www.universalmusic.com/label/republic-records/ (last visited Jan. 4, 2023).

Motown Records, Def Jam Recordings, Universal Music Group Nashville, Universal Music Latin Entertainment, EMI Records and Polydor, and its classical and jazz labels are Blue Note Records, Decca, Deutsche Grammophone and Verve Label Group."[3]

21.    "UMG's recorded music business' distribution operations includes entering into agreements with digital music services to make its music available to users."[4]

22.    Spotify is a Swedish audio streaming and media services provider, founded in April 2006.

23.    In or around the summer of 2008, several major record labels, including Universal, acquired equity stakes in Spotify.  Universal acquired 97,827 shares, or just over 5% of total Spotify shares.[5]  The multiple record labels collectively purchased a total of 352,176 Spotify shares for only €8,804.40 (roughly $12,175 today).[6]

24.    As part of the consideration for the Spotify equity Universal purchased, Universal agreed to receive lower royalty payments from licensing its catalog of recordings by Plaintiffs and the Class.  As a result, Plaintiffs and the Class received lower royalty payments than they would have otherwise.

25.    In November 2011, Universal acquired EMI Recorded Music ("EMI"), and the acquisition was approved and became official in September 2012.

---

[3] Prospectus at 49.

[4] Prospectus at 50.

[5] Ingham, Tim, *Here's Exactly How Many Shares the Major Labels and Merlin Bought in Spotify – and What Those Stakes are Worth Now*, MUSIC BUSINESS WORLDWIDE, May 14, 2018, https://www.musicbusinessworldwide.com/heres-exactly-how-many-shares-the-major-labels-and-merlin-bought-in-spotify-and-what-we-think-those-stakes-are-worth-now/ (last visited Jan. 4, 2023).

[6] *Id.*

26.    EMI acquired 39,131 Spotify shares in or around the summer of 2008.   On information and belief, EMI's Spotify shares were included in Universal's purchase of EMI.

27.    On April 3, 2018, Spotify held an initial public offering.[7]

28.    In the September 2021 Prospectus, Universal revealed for the first time that it held approximately 3.35% of Spotify shares, valued at €1.475 billion (approximately $1.712 billion today).[8]

29.    On information and belief, a substantial portion of the Spotify shares Universal disclosed in this Prospectus stemmed from the shares Universal acquired in or around 2008, as well as shares EMI acquired in or around 2008 that were subsequently transferred to Universal, and shares of other labels acquired by Universal.

### III.    Universal's Standard Recording Contracts with Artists

30.    In Universal's standardized contract, recording artists agree to assign the copyright in the sound recordings of the artists' musical performances in consideration for royalty payments, including 50% of the "net receipts" Universal receives from any "use or exploitation(s)" of the recordings.[9]

31.    Universal then packages and markets the recordings on albums or as singles and distributes them through brick-and-mortar record stores, online record stores, and digital music streaming services such as Spotify.  Universal accounts to artists for its receipts in accordance with the Company's standard contract.

---

[7] Pisani, Bob, *Spotify's IPO disrupted Wall Street.  What lies ahead now for unicorns looking to go public*, CNBC, May 22, 2018, https://www.cnbc.com/2018/05/22/spotifys-ipo-disrupted-wall-street-what-lies-ahead-now-for-unicorns-looking-to-go-public.html (last visited Jan. 4, 2023).

[8] Prospectus at F-45, F-99.

[9] Ex. A at ¶ 7.06(a).

32.   In or around July 1990, Plaintiffs entered into a contract with Universal's predecessor-in-interest, Polygram.  This contract was amended and revised in July 1991.

33.   The "ROYALTIES" provisions of the contract provide that the royalties UMG pays to Plaintiffs "shall be a sum equal to fifty percent (50%) of [Universal's] net receipts with respect to" the "exploitation" for any "use or exploitation" of "Master Recordings" created by Plaintiffs.[10]

34.   The contract defines "net receipts" as amounts "which are solely attributable to the Master Recordings hereunder . . . after deduction of any costs or expenses or amounts which [Universal] is obligated to pay to third parties (such as, without limitation, production costs, mechanical copyright payments, AFofM and other union or guild payments)."[11]

35.   On information and belief, all contracts between Universal and artists contain the same or substantially similar provisions regarding royalties and accountings for royalties.

36.   Universal licensed its catalog, including the Black Sheep recordings on the albums *A Wolf In Sheep's Clothing* and *Non-Fiction* to Spotify.  Part of the consideration for this license was UMG's Spotify equity, which exchange resulted in lower royalty payments to UMG than Spotify would have otherwise paid, and thus lower royalty payments to Plaintiffs.  *A Wolf In Sheep's Clothing* and *Non-Fiction*, and all tracks on them, have been available on Spotify since 2011.  The license to Spotify is a "use or exploitation" of Plaintiffs' "Master Recordings" under their contract with UMG.

37.   The "ACCOUNTINGS" provisions of Plaintiffs' contract require that Universal account for royalties "no less frequently than semi-annually, together with payment of accrued

---

[10] Ex. A at ¶ 7.06(a).  A "Master Recording" is defined in the contract as "any recording of sound, whether or not coupled with a visual image, by any method on any substance or material, whether now or here after known . . . ."  *Id.* ¶ 13.01.

[11] Ex. A at ¶ 7.06(b).

royalties" earned by Plaintiffs during the royalty accounting period.[12]   The accounting and payments must be made no later than September 30 for royalties accrued between January and June of the same year, and no later than March 31 for royalties accrued between July and December of the preceding year.[13]

## IV.   How Universal Breached Its Recording Contracts, the Covenant of Good Faith and Fair Dealing, and was Unjustly Enriched

38.   Universal breached and continues to breach its contracts with Plaintiffs and the Class in at least 3 ways:

| Paragraph | Relevant Language | How UMG Breached |
|---|---|---|
| 7.06 | "With respect to the [] exploitation of Master Recordings, the royalty to be accrued hereunder shall be a sum equal to fifty percent (50%) of [Universal's] net receipts with respect to such exploitation . . . ." | UMG negotiated lower royalty payments from Spotify in exchange for stock and then retained the stock for its own benefit instead of either (i) compensating Plaintiffs and the Class for the lowered royalty payments, or (ii) distributing 50% of the Spotify stock to Plaintiffs and the Class. |
| 8.01 | "Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made" by UMG on a timetable set forth in the contract. | UMG failed to account for its Spotify stock in the royalty statements it provided to Plaintiffs and the Class. |
| N/A (in the alternative) | Alternatively, when a contract does not specify a time for performance, the law implies a reasonable time for performance. *Guilbert v. Gardner*, 480 F.3d 140, 144 (2d Cir. 2007). Here, the contract does not specify when UMG was required to distribute the Spotify stock to artists. The reasonable time to do so was following Spotify's April 2018 IPO. | UMG failed to compensate Plaintiffs and the Class for the value of its unlawfully retained Spotify stock in a reasonable timeframe. |

[12] Ex. A at ¶ 8.01.

[13] *Id.*

The facts underpinning UMG's breaches are further detailed below.

39.    For approximately a decade, Universal omitted from the royalty statements Universal issued to Plaintiffs that it had received Spotify stock in connection with the "use or exploitation" of Black Sheep recordings.

40.    As the result of its agreement with Spotify for stock, Universal agreed to receive lower cash royalty payments than it would have otherwise agreed to receive.

41.    Universal did not disclose to Plaintiffs and the Class that it had exchanged a significant equity stake in Spotify as part of its licensing of artists' works to Spotify, nor the resulting lower royalty payments.

42.    Universal did not compensate Plaintiffs and the Class for the value of its Spotify equity, and therefore failed to compensate Plaintiffs and the Class 50% of net receipts as required by the contract.  For example, in Plaintiff McLean's royalty statement for the period January 1, 2022 through June 30, 2022, there are various entries for Spotify royalties earned from digital streaming, but no entries about Universal's Spotify equity holdings.  Universal's failure to abide by the payment terms in ¶ 7.06 of the contract breached that provision of the contract with each royalty payment made to Plaintiffs and the Class.

43.    Alternatively, UMG breached the contract when, after Spotify went public in April 2018 and Spotify stock became easily valued and transferable in the open market, UMG failed to compensate Plaintiffs and the Class for their 50% proportional share of the Spotify stock.  The contract does not include an explicit provision as to the time for performance of UMG compensating Plaintiffs and the Class for its retained Spotify stock, but the Company's failure to act for well over three years is unreasonable and constitutes a breach of contract.

44.    Pursuant to ¶ 8.01 of the contract, Universal was required to make "accountings" as to royalties owed to Plaintiffs and the Class twice per year, with payments on or before September

11

30th for royalties accruing for the half-year period ending the preceding June 30th, and on or before March 31st for the half-year ending the preceding December 31st. Universal's failure to account for its Spotify equity in each royalty statement provided to Plaintiffs and the Class breached contract ¶ 8.01.

45.     UMG's contractual breaches are continuing through today.

46.     As a result of its continuing contractual breaches, Universal has unlawfully retained approximately $750 million in royalties that should have been paid to Plaintiffs and the Class.

47.     Universal not only has breached its contract with Plaintiffs by failing to compensate them for the depressed royalty payments made possible by UMG's deal with Spotify, but it also concealed from Plaintiffs and the Class that the Company had received and retained 100% of its Spotify stock. This additional wrong prevented Plaintiffs and the Class from questioning their royalty payments.

48.     In entering into the contract, Plaintiffs reasonably expected that UMG would not secretly license its catalog without compensating artists for the proceeds of the licensing agreements. Without these reasonable expectations, Plaintiffs would not have entered into record contracts with Universal. UMG's failure to disclose and compensate Plaintiffs for its Spotify stock breached the covenant of good faith and fair dealing, which is implied in every contract.

49.     Plaintiffs are but two of many artists harmed by Universal's practices. The purpose of this class action is to obtain redress for all of Universal's artists and to reform Universal's royalties practices going forward.

## CLASS ALLEGATIONS

50.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Universal. Universal has engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of Universal, at law and in equity, for its

knowledge and conduct. Universal's conduct did not meaningfully differ among individual Class Members in its degree of care or candor, its actions or inactions, in the content of its contractual promises and/or improper use of any royalty payment discretion, or in its false and misleading statements or omissions. On information and belief, the royalties and accountings provisions of Universal's agreements with its artists are materially the same. The objective facts on these subjects are the same for all Class Members.

51. Plaintiffs sue on their own behalf and on behalf of a Class for monetary and equitable relief under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

52. The Class, preliminarily defined as three subclasses ("Subclasses"), is as follows:

    a. The Multistate Class, preliminarily defined as all Universal artists in the United States and territories (including artists who signed contracts with companies Universal acts as a successor to) whose works were licensed by Defendant to Spotify at any time from [applicable statute of limitations period] to the date of judgment.

    b. The State Classes, preliminarily defined as all Universal artists in the state or territory of [*e.g.*, New York, California, etc.] (including artists who signed contracts with companies Universal acts as a successor to) whose works were licensed by Defendant to Spotify at any time from [applicable statute of limitations period] to the date of judgment.

    c. The Contractual Classes, preliminarily defined as all Universal artists whose contracts with Universal (or companies Universal acts as a successor to) set the governing law in the state or territory of [*e.g.*, New York, California, etc.] (including artists who signed contracts with companies Universal acts as a successor to) whose works were licensed by Defendant to Spotify at any time from [applicable statute of limitations period] to the date of judgment.

53. As used in the Class definition, "Universal artists" refers to any party to an agreement with any record label owned or controlled by Universal.

54. Excluded from the Class are: Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative,

predecessor, successor, or assignee of Defendant.  Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

55.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

56.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Universal.  Plaintiffs believe, however, that the Class encompasses at least thousands of artists whose identities can be readily ascertained from Universal's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

57.    The Class is ascertainable because its members can be readily identified using data and information kept by Universal in the usual course of business and within its control.  Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

58.    Plaintiffs are adequate class representatives.  Plaintiffs' claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by Universal.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

59.    Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

60.   Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   whether Universal breached the terms of its contracts;

      b.   whether Universal violated the duty of good faith and fair dealing in its royalty payment practices;

      c.   whether Universal was unjustly enriched as a result of its conduct;

      d.   whether Class Members have been injured by Universal's conduct;

      e.   whether, and to what extent, equitable relief should be imposed on Universal to prevent it from continuing its unlawful practices; and

      f.   the extent of class-wide injury and the measure of damages for those injuries.

61.   A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct; (3) Universal has acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

62.   Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

      a.   whether Universal breached the terms of its contracts;

15

b. whether Universal violated the duty of good faith and fair dealing in its royalty payment practices

c. whether Universal was unjustly enriched as a result of its conduct;

d. whether Class Members have been injured by Defendant's conduct; and

e. whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

63. Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rule of Civil Procedure.

## CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT

### (ON BEHALF OF EACH CLASS MEMBER UNDER THE LAW OF THEIR STATE OR, ALTERNATIVELY, THE LAW SPECIFIED IN THEIR UMG CONTRACT)

64. Plaintiffs repeat and reallege the allegations set forth above as though set forth fully herein.

65. Plaintiffs and the Class entered into valid contracts with Defendant that provided for, among other things, the "use or exploitation" of Plaintiffs' Master Recordings in exchange for royalty payments.

66. Pursuant to those contracts, Universal was required to pay Plaintiffs and all Class Members royalties in a sum "equal to fifty percent (50%) of [Universal's] net receipts with respect to" the "exploitation" for any "use or exploitation" of "Master Recordings" created by Plaintiffs.

67. Pursuant to those contracts, Universal was required to make "accountings" as to royalties owed to Plaintiffs and all Class Members twice per year, with payments on or before September 30th for royalties accruing for the half-year period ending the preceding June 30th, and on or before March 31st for the half-year ending the preceding December 31st.

16

68.    Pursuant to those contracts, Plaintiffs agreed to make their Master Recordings available to Universal so the Company could license or otherwise monetize Plaintiffs' Master Recordings, and Plaintiffs did so.

69.    However, Defendant failed to pay Plaintiffs 50% of Universal's net receipts because it did not compensate Plaintiffs for their share of the Spotify equity Universal received in exchange for lower royalty payments from Spotify to Universal.

70.    Defendant also failed to make an "accounting" to Plaintiffs, in royalty statements or otherwise, that disclosed and compensated Plaintiffs for Defendant's unlawfully retained Spotify equity and the reduced royalty payments.

71.    Alternately, after Spotify went public in 2018 Defendant failed to distribute to Plaintiffs and all Class Members 50% of Spotify stock the Company held or its cash equivalent.

72.    Plaintiffs and all Class Members were damaged as a result because their royalty payments for Spotify streaming were less than 50% of net receipts and lower than they would have been had Defendant not agreed to receive lower royalty payments from Spotify.

73.    As a result of Defendant's ongoing breaches, Universal is liable to Plaintiffs and members of the Class for damages and attorneys' fees and expenses.

## COUNT II

**IN THE ALTERNATIVE, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

**(ON BEHALF OF EACH CLASS MEMBER UNDER THE LAW OF THEIR STATE OR, ALTERNATIVELY, THE LAW SPECIFIED IN THEIR UMG CONTRACT)**

74.    Plaintiffs repeat and reallege the allegations set forth above as though set forth fully herein.

75.     Plaintiffs and the Class entered into valid contracts with Defendant that provided for, among other things, the "use or exploitation" of Plaintiffs' Master Recordings in exchange for royalty payments.

76.     Pursuant to those contracts, Universal was required to pay Plaintiffs and all Class Members royalties in a sum "equal to fifty percent (50%) of [Universal's] net receipts with respect to" the "exploitation" for any "use or exploitation" of "Master Recordings" created by Plaintiffs.

77.     Pursuant to those contracts, Universal was required to make "accountings" as to royalties owed to Plaintiffs and all Class Members twice per year, with payments on or before September 30th for royalties accruing for the half-year period ending the preceding June 30th, and on or before March 31st for the half-year ending the preceding December 31st.

78.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

79.     Under the contract, to the extent Universal had discretion to license its catalog for non-cash consideration such as equity in start-up companies like Spotify, it was obliged to exercise its discretion in good faith.

80.     Plaintiffs reasonably expected that Universal would disclose any non-cash consideration received by Universal from licensing its catalog, and that Universal would not secretly license its catalog without disclosing this fact to its artists and without compensating artists for the proceeds of the licensing agreements.  A reasonable counterparty to a Universal contract would not expect Universal to use any discretion it had regarding licensing an artist's catalogue in exchange for non-cash consideration to profiteer off the information asymmetry between Universal and its artists.  Even if Universal had unilateral discretion to accept non-cash compensation as part of licensing deals and then to determine when to provide that compensation to artists, Plaintiffs

and other reasonable artists expect that notwithstanding Defendant's profit goals, it would refrain from concealing royalties from Plaintiffs.  Without these reasonable expectations, Plaintiffs would not have entered into contracts with Universal.

81.    Universal breached the implied covenant of good faith and fair dealing by secretly licensing its catalog to acquire an equity stake in Spotify, thus frustrating Plaintiffs' and other Class Members' reasonable expectations that Universal would compensate Plaintiffs for its net receipts from licenses of their works.

82.    As a result of Universal's breaches, Universal is liable to Plaintiffs and members of the Class for damages and attorneys' fees and expenses.

## COUNT III

### IN THE ALTERNATIVE, UNJUST ENRICHMENT

**(ON BEHALF OF EACH CLASS MEMBER UNDER THE LAW OF THEIR STATE OR, ALTERNATIVELY, THE LAW SPECIFIED IN THEIR UMG CONTRACT)**

83.    Plaintiffs repeat and reallege the allegations set forth above as though set forth fully herein.

84.    Plaintiffs and all Class Members have been paid less than 50% of net receipts from Defendant's "use or exploitation" of Plaintiffs' Master Recordings because Universal has unlawfully retained the Spotify equity it received as part of its agreement with Spotify to license Plaintiffs' Master Recordings in exchange for lower royalty payments from Spotify.

85.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what is reasonable.  This conduct was also undertaken at the expense of Plaintiffs and all Class Members.

86.    In would be unjust and inequitable for Defendant to retain the sums that it should have paid to Plaintiffs and all Class Members.

87.    Therefore, Defendant is liable to Plaintiffs and all Class Members for the damages they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Class defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firm as Class Counsel;

(b)    Find that Defendant UMG Recordings, Inc. has committed the wrongful conduct alleged herein;

(c)    Render an award of compensatory damages, the precise amount of which will be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in deceptive practices alleged herein;

(e)    Declare that Defendant has committed the wrongful conduct alleged herein;

(f)    Render an award of punitive damages;

(g)    Enter judgment including interest, costs, reasonable attorneys' fees, and expenses;

(h)    Grant all such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand that a jury determine any issue triable of right.

Dated: January 4, 2023
New York, New York

**WITTELS MCINTURFF PALIKOVIC**

By:    /s/ J. Burkett McInturff
J. Burkett McInturff (JM-4564)
Steven L. Wittels (SW-8110)
Ethan D. Roman (ER-5569)
305 BROADWAY, FLOOR 7
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile: (914) 273-2563
jbm@wittelslaw.com
slw@wittelslaw.com
edr@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*