UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDRES TITUS and WILLIAM MCLEAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    -against-<br><br>UMG RECORDINGS, INC.,<br><br>        Defendant. | Case No. 1:23-cv-00015<br><br>**OPINION AND ORDER** |

JENNIFER L. ROCHON, United States District Judge:

   Plaintiffs Andres Titus and William McLean ("Plaintiffs") bring this putative class action against Defendant UMG Recordings, Inc. ("UMG" or "Defendant"), alleging New York state-law violations for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. *See* ECF No. 1 ("Compl."). Before the Court is UMG's motion to dismiss the complaint. For the following reasons, the motion is GRANTED.

## BACKGROUND[1]

### I. Factual Background

#### A. The Contract

   Defendant, also known as Universal Music Group, is an American music corporation. *Id.* ¶ 12. As a record label, Defendant enters into recording contracts with musical artists, who assign the copyrights for their sound recordings to UMG in exchange for royalty payments. *Id.* ¶¶ 1, 31. Defendant markets and distributes these recordings, then accounts to

---

[1] On a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

artists for their royalties.  *See id.*

On July 23, 1990, Polygram Records, Inc. ("Polygram"), for which Defendant is the successor-in-interest, formed a recording contract with Plaintiffs, who are known professionally as the hip-hop duo "Black Sheep."  *Id.* ¶ 16; *see* Compl. Ex. A ("Contr.") § X. The parties amended the contract on July 5, 1991.  Compl. ¶ 32; *see* Contr. at 1.  In 1998, Polygram and UMG merged, with UMG assuming Polygram's contract with Plaintiffs. Compl. ¶ 19.

At issue in this case are the contract provisions concerning Plaintiffs' royalties and Defendant's accounting of those royalties.  *See id.* ¶¶ 33-49; Contr. § 7 (the "Royalties Section") (stating that Defendant "shall accrue to the account of Artist in accordance with the provisions of Article 8 below the following royalties for the sale of Phonograph Records derived from Master Recordings hereunder provided"); *id.* § 8 (the "Accountings Section").

The Royalties Section provides that "[w]ith respect to the . . . exploitation of Master Recordings, the royalty to be accrued  . . . shall be a sum equal to fifty percent (50%) of [Defendant's] net receipts with respect to . . . any use(s) or exploitation(s) of Master Recordings."  Contr. § 7.06(a).  "Net receipts" are defined as "amounts received by [Defendant] in connection with the subject matter thereof which are *solely attributable* to the Master Recordings hereunder . . . , after deduction of any costs or expenses or amounts which [Defendant] is obligated to pay to third parties (such as, without limitation, production costs, mechanical copyright payments, AFofM and other union or guild payments."  *Id.* § 7.06(b) (emphasis added).

The Accountings Section establishes a schedule for Defendant to pay Plaintiffs royalties that have accrued.  *See id.* § 8.01.  For royalties accrued between January 1 and June 30 of a given year, "[a]ccountings as to royalties accruing or which otherwise would have

accrued . . . shall be made by [Defendant] to [Plaintiffs] on or before September 30th." *Id.*
For royalties accrued between July 1 and December 31 of the preceding year, Defendant must
account for those royalties and pay them to Plaintiffs "on or before March 31st." *Id.* "[I]n no
case" is Defendant to make such accountings "less frequently than semi-annually, together
with payment of accrued royalties, if any, earned by [Plaintiffs] during such preceding half-
year." *Id.*

The contract also grants UMG "the sole, exclusive and unlimited right throughout the
world to . . . license" Plaintiffs' works and to "at [UMG's] election, delay or refrain from
doing" so. *Id.* § 5.01(a). The contract states elsewhere that "[t]he method, manner and extent
of . . . distribution and exploitation of Master Recordings and Records shall be within the sole
discretion of [UMG] unless otherwise herein specifically provided." *Id.* § 14.03.

Other relevant provisions state that the contract "shall be construed in accordance with
the laws of New York," *id.* § 14.07, and that Plaintiffs "will not have the right to bring an
action against [UMG] in connection with any royalty accounting or payments hereunder
unless [Plaintiffs] commence[] the suit within two (2) years from the date such statement of
accounting for royalties or such payment was due," *id.* § 8.05(a) (the "Contractual Limitations
Provision"). All of Defendant's recording contracts with other musical artists[2] (together with
Plaintiffs, the "Class") "contain the same or substantially similar provisions regarding
royalties and accountings for royalties." Compl. ¶ 35.

## B.  Defendant's Acquisition of Spotify Equity Shares

In the summer of 2008, several record labels (including UMG) acquired equity shares
in Spotify, a Swedish audio-streaming and media-services provider founded in April 2006.

---

[2] For the purposes of this motion, the Court accepts the Plaintiffs' definition of the term the
"Class," as defined in the Complaint.

Compl. ¶¶ 22-23.  Collectively, the record labels purchased 352,176 Spotify shares for the equivalent of roughly $12,175.  *Id.* ¶ 23.  Over a fourth of that total, consisting of 97,927 Spotify shares, went to UMG.  *Id.*  "As part of the consideration" for these shares, UMG "agreed to receive lower royalty payments from licensing its catalog of recordings by Plaintiffs" and other artists.  *Id.* ¶ 24; *see id.* ¶ 40 (same).  Because of this deal, Plaintiffs "received lower royalty payments than they would have otherwise."  *Id.* ¶ 24.  UMG did not compensate Plaintiffs for these reduced payments or distribute half of the Spotify shares to the Class.  *Id.* ¶ 38.  Nor did UMG disclose to Plaintiffs that it had licensed their works to Spotify in exchange for an equity stake, or that this exchange resulted in lower royalty payments for them.  *Id.* ¶ 41.

UMG acquired more Spotify shares after 2008.  In September 2012, UMG purchased EMI Recorded Music ("EMI"), which had also bought 39,131 Spotify shares in the summer of 2008.  *Id.* ¶¶ 25-26.  UMG's purchase of EMI included these shares.  *Id.* ¶ 26.  On April 3, 2018, Spotify held an initial public offering ("IPO").  *Id.* ¶ 27.  UMG did not compensate the proposed Class for its 50% share of the Spotify stock after Spotify went public.  *Id.* ¶ 43; *see* Contr. § 7.06.  In a prospectus published in September 2021, UMG revealed that it owned approximately 3.35% of all Spotify shares, a stake valued at €1.475 billion (approximately $1.712 billion today).  Compl. ¶ 28.  A "substantial portion" of these shares stemmed from the shares that UMG had acquired either directly in 2008 or indirectly through its purchase of EMI.  *Id.* ¶ 29.

Plaintiffs allege that, by failing to account for its Spotify equity in its royalty payments, UMG has kept approximately $750 million that it should have paid to Plaintiffs and the rest of the proposed Class.  *Id.* ¶ 46.

## II.   Procedural History

Plaintiffs filed their Class Action Complaint on January 4, 2023.  *See generally*
Compl.  On February 27, 2023, Defendant filed a motion to dismiss the Complaint.  *See* ECF
Nos. 19 ("Br."), 27 ("Reply").  Plaintiffs opposed the motion.  *See* ECF No. 26 ("Opp.").  The
motion was fully briefed on April 21, 2023, and it is presently before the Court.  *See generally*
Reply.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule")
12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, the facts must be
sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for
the misconduct alleged."  *Id.*  On a Rule 12(b)(6) motion, the Court must "accept all factual
allegations as true, and draw all reasonable inferences in the plaintiff's favor."  *DiFolco v.
MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010 (alterations adopted) (quoting
*Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  The Court shall not "accept as
true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (quoting
*Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice."  *Id.*  Determining whether a
complaint states a claim is "a context-specific task that requires the reviewing court to draw
on its judicial experience and common sense."  *Id.* at 679.  "[T]he court's task is to assess the
legal feasibility of the complaint; it is not to assess the weight of the evidence that might be
offered on either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

"In considering a motion to dismiss for failure to state a claim under [Rule] 12(b)(6), a

district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (quotation marks and citation omitted). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the . . . complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

## DISCUSSION

Plaintiffs advance two theories of UMG's alleged breach of the contract between them. Under their first theory, UMG failed to "compensat[e] Plaintiffs and the Class for the lowered royalty payments" that it negotiated in exchange for Spotify stock. Compl. ¶ 38; *see id.* ¶ 40. Under Plaintiffs' second theory, UMG breached the contract by failing to "distribut[e] 50% of the Spotify stock to Plaintiffs and the Class." *Id.* ¶ 38; *see id.* ¶ 42. For both theories of breach, Plaintiffs suggest that UMG committed an additional breach of the contract each time it issued a "depressed" royalty payment that failed to compensate Plaintiffs for those lower royalties or otherwise account for the value of UMG's Spotify equity. *Id.* ¶ 47; *see id.* at ¶¶ 42, 44-45. Plaintiffs also allege that UMG "concealed from Plaintiffs and the Class that [it] had received and retained 100% of its Spotify stock," thereby committing an "additional wrong [that] prevented Plaintiffs and the Class from questioning their royalty payments." *Id.* ¶ 47.

Plaintiffs alternatively allege that "UMG breached the contract when, after Spotify went public in April 2018 and Spotify stock became easily valued and transferable in the open market, UMG failed to compensate Plaintiffs" for, or distribute their share of, the Spotify stock. *Id.* ¶ 43. Although Plaintiffs acknowledge that the contract has no "explicit provision"

as to when UMG must compensate the proposed Class for its Spotify stock, they argue that Defendant's "failure to act for well over three years" since Spotify's IPO was "unreasonable and constitutes a breach of contract."  *Id.*

UMG responds that Plaintiffs' claims are time barred, asserting that they were filed over a decade after the alleged breach.  Br. at 1-2.  UMG also argues that the claims fail as a matter of law because (1) the breach-of-contract claim conflicts with the plain language of the contract and, to the extent that it turns on Defendant's conduct after Spotify's 2018 IPO, is unripe; (2) the claim for breach of the duty of good faith and fair dealing (the "covenant claim") duplicates the breach-of-contract claim and imposes implied obligations inconsistent with the express terms of the contract; and (3) the unjust-enrichment claim must yield to the parties' contract, which limits Plaintiffs' recovery to what is established under the contract. *Id.* at 2-3.  The Court addresses each of these arguments in turn.

## I.   Statute of Limitations

Defendant urges the Court to dismiss the complaint because it is time barred.  *Id.* at 6-10.  Defendant argues that under New York law, Plaintiffs had six years after the contract's alleged breach in 2008 to bring their claims, and that their failure to do so renders those claims untimely.  *See id.* at 7-9.  Defendant further argues that the contract contains a two-year contractual limitations period, which independently bars Plaintiffs' claims.  *See id.* at 9-10.  Plaintiffs respond that their claims are timely because:  (1) Defendant continues to breach the contract with each royalty payment that fails to compensate Plaintiffs for their depressed royalties or account for UMG's Spotify stock; (2) the statute of limitations did not begin to run until after a reasonable time for Defendant's performance; and (3) the limitations period is subject to equitable tolling.  *See* Opp. at 6-15.

**A.  Relevant Law**

Because the relevant dates appear on the face of Plaintiffs' complaint, the Court may

rule as a matter of law on UMG's motion to dismiss on statute-of-limitations grounds.  *See*

*LiveIntent, Inc. v. Naples*, 293 F. Supp. 3d 433, 442 (S.D.N.Y. 2018).  A complaint is subject

to dismissal for failure to state a claim if its allegations "show that relief is barred by the

applicable statute of limitations."  *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 259

(S.D.N.Y. 2008) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

Under New York law,[3] Plaintiffs must bring their claims for breach of contract and

breach of the implied covenant of good faith and fair dealing within six years of the alleged

breach.  N.Y. C.P.L.R. § 213(2) (stating that "an action upon a contractual obligation or

liability, express or implied" must be "commenced within six years"); *see Guilbert v.*

*Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("A cause of action for breach of contract

ordinarily accrues and the limitations period begins to run upon breach.").  Plaintiffs need not

be aware of the breach to start the statute-of-limitations period.  *Guilbert*, 480 F.3d at 149

(citing *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 987 (N.Y. 1993)); *see*

*V.E.C. Corp. of Del. v. Hilliard*, 896 F. Supp. 2d 253, 260 (S.D.N.Y. 2012) ("It is well settled

that under New York law the statute of limitation for breach of contract begins to run from the

day the contract was breached, not from the day the breach was discovered, or should have

been discovered." (alterations adopted) (quoting *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,

---

[3] The parties agree, and the Court concludes, that New York law applies.  *See, e.g.*, Br. at 2;
Opp. at 2.  "A federal court sitting in diversity applies the choice-of-law rules of the state in
which it sits."  *LiveIntent*, 293 F. Supp. 3d at 441.  Under New York choice-of-law rules,
choice-of-law provisions are honored "as long as the state selected has sufficient contacts with
the transaction."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230
F.3d 549, 556 (2d Cir. 2000).  The contract, signed in New York, also contains a New York
choice-of-law provision.  Contr. at 1, § 14.07.  Therefore, the Court applies New York law in
interpreting the contract.

120 F.3d 351, 360 (2d Cir. 1997))); *ACE Sec. Corp. v. DB Structured Prod., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015) ("New York does not apply the 'discovery' rule to statutes of limitations in contract actions.").  However, under New York's continuing violations doctrine, "where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew."  *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 121-22 (2d Cir. 2020) (quoting *Stalis v. Sugar Creek Stores, Inc.*, 744 N.Y.S.2d 586, 587 (4th Dep't 2002)); *accord Guilbert*, 480 F.3d at 150 (collecting cases).

For unjust-enrichment claims, the New York statute of limitations depends on the substantive relief sought; the limitations period is three years where the plaintiff seeks monetary damages, and six years where the plaintiff seeks equitable relief.  *See Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).  In either case, the statute of limitations "begins to run 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.'"  *Id.* (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013)).

### B.  Analysis

As a preliminary matter, the Court finds that the Contractual Limitations Provision creates a two-year statute of limitations for Plaintiffs' contract claims.  Under New York law, parties to a contract can agree to shorten the statute of limitations.  *123RF LLC v. HSBC Bank USA, N.A.*, --- F. Supp. 3d ---, 2023 WL 2611632, at *4 (S.D.N.Y. Mar. 23, 2023); *see* N.Y. C.P.L.R. § 201 (allowing a "shorter time [to be] prescribed by written agreement"); *John J. Kassner & Co. v. City of New York*, 389 N.E.2d 99, 103 (N.Y. 1979) ("[A]n agreement which modifies the Statute of Limitations by specifying a shorter, but reasonable, period within which to commence an action is enforceable.").  The language of the Contractual Limitations Provision is clear:  Plaintiffs agreed to bring against UMG a claim or legal action "in

connection with any royalty accounting or payments" within two years "from the date such statement of accounting for royalties or such payment was due."  Contr. § 8.05(a).

Plaintiffs do not challenge the reasonableness of a two-year contractual limitations period, but rather argue that the Contractual Limitations Provision is ambiguous as to whether it applies to royalty accountings or payments "that were left off UMG's statements," such as those not made for UMG's Spotify stock.  Opp. at 9-10.  Whether a contract is ambiguous is a question of law that the Court can decide at the pleading stage, *see Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015), and the Court concludes as a matter of law that the Contractual Limitations Provision unambiguously applies to Plaintiffs' claims.  The provision covers actions relating to "*any* royalty accounting or payments," which plainly include Plaintiffs' claims of underpaid royalties and inaccurate accounting.  Contr. § 8.05(a) (emphasis added); *see* Compl. ¶¶ 38-44.  An action as to royalty payments involves, almost by definition, some kind of non-payment.  To conclude that the provision's plain language does not apply to non-payments would effectively void the Contractual Limitations Provision.  *See Nomura Home Equity Loan, Inc., Series 2006-FM2 ex rel. HSBC Bank USA, N.A. v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743 (N.Y. 2017) ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect." (quotation marks and citation omitted)).  Therefore, Plaintiffs' claims for unpaid royalties from the stock and for underpayment of royalties that were negotiated in exchange for the stock are subject to a two-year statute of limitations.

Under this two-year limitations period, Plaintiffs' claims as to non-payment for a share of UMG's Spotify stock are untimely.  By Plaintiffs' own admission, UMG's first alleged breach of the contract occurred in or around 2008, when it failed to account for the value of its Spotify stock in its semiannual royalty statements.  Compl. ¶ 39 (noting that UMG has

omitted its Spotify holdings from the royalty statements issued to Plaintiffs "[f]or approximately a decade"); *see id.* ¶¶ 38-44.  Plaintiffs' claims accrued 15 years ago.  Even accepting Plaintiffs' alternative argument that UMG breached the contract again after Spotify's IPO in 2018, Plaintiffs' failure to bring those claims within two years of UMG's alleged breach still renders them untimely.

As stated previously, Plaintiffs assert three reasons for the general timeliness of their claims:  (1) UMG committed a series of breaches that is timely under the continuing violations doctrine; (2) the statute of limitations period did not begin to run until a reasonable time for UMG's performance had passed; and (3) equitable tolling applies because UMG concealed its Spotify holdings.  *See* Opp. at 5-15.  The Court will address each argument in turn.

### 1. *Continuing Violations Doctrine*

According to Plaintiffs, New York courts regularly apply the continuing violations doctrine to deem contract claims timely.  *See* Opp. at 6 (collecting cases).  Under the doctrine, "where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously."  *Miller*, 979 F.3d at 121-22 (citation omitted); *accord Guilbert*, 480 F.3d at 150 (collecting cases).  However, the doctrine "may only be predicated on continuing unlawful acts," and "not on the continuing effects of earlier unlawful conduct."  *Selkirk v. New York*, 671 N.Y.S.2d 824, 825 (3d Dep't 1998).

With respect to UMG's Spotify stock, the contract does not require continuing performance.  To the extent that UMG owed Plaintiffs any Spotify stock or the value thereof, it breached the contract once – in 2008 – by failing to make a single payment of cash or equity.  *See* Contr. § 8.01 (requiring the semiannual payment of royalties that accrued "during

[the] preceding half-year"); *LiveIntent*, 293 F. Supp. 3d at 443 (finding no continuing violation where a party "failed to make a single conveyance of stock" and the pleadings contain no allegation that the party was required "to convey stock . . . on an ongoing basis"). Plaintiffs do not allege that UMG receives Spotify stock on an ongoing basis, which distinguishes Plaintiffs' cited cases. *See Guilbert*, 480 F.3d at 150 (concerning the defendants' obligation to make annual contributions to the plaintiff's pension fund); *Bulova Watch Co. v. Celotex Corp.*, 389 N.E.2d 130, 130-31 (N.Y. 1979) (concerning a defendant's 20-year promise to maintain a roof for which it had sold roofing materials); *Mullin v. WL Ross & Co.*, 105 N.Y.S.3d 382, 383 (1st Dep't 2019) (alleging that the defendant underpaid regular distributions of carried interest and profits due to the plaintiff); *Affordable Hous. Assocs., Inc. v. Town of Brookhaven*, 13 N.Y.S.3d 876, 877-80 (Sup. Ct. 2015) (concerning contract that required the defendant to share monthly rental revenue), *aff'd*, 54 N.Y.S.3d 122 (2d Dep't 2017); *Barash v. Est. of Sperlin*, 706 N.Y.S.2d 439, 440 (2d Dep't 2000) (alleging the ongoing receipt of income and profits from co-owned property that the defendant failed to share).

Plaintiffs also claim that UMG did not commit a "single breach" in 2008 but rather a "series of independent and distinct wrongs" that were renewed "with each royalty statement to Plaintiffs." Opp. at 7 (emphases omitted). The contract, however, refutes this characterization. Under the Accountings Section, UMG was to account semiannually for royalties that had accrued "during [the] preceding half-year": once by September 30th for royalties accrued during the first six months of the calendar year, and again by March 31st for royalties accrued during the last six months of the same year. Contr. § 8.01. Taking Plaintiffs' allegations as true, UMG needed to account to Plaintiffs for its initial acquisition of Spotify stock in either September 2008 or March 2009, and breached the contract when it

failed to do so.  *See* Compl. ¶¶ 23-24.  Plaintiffs do not allege that the contract entitles them to an ongoing distribution of profits in connection with UMG's Spotify shares; they seek only a single monetary disbursement.  Therefore, UMG's ongoing failure to pay this disbursement on subsequent royalty checks represents "the continuing effects of earlier unlawful conduct" to which the continuing violations doctrine does not apply.  *Selkirk*, 671 N.Y.S.2d at 825; *see Commack Self-Serv. Kosher Meats, Inc. v. New York*, 704 N.Y.S.2d 737, 739 (3d Dep't 2000) (noting that "the mere fact that claimants may continue to suffer damage . . . does not alter the fact that the [defendant's] unlawful conduct, if any, occurred five years before the claim was filed").

However, Plaintiffs' claims are timely under New York's continuing violations doctrine insofar as Plaintiffs argue that UMG agreed to accept lowered royalty payments (to the detriment of Plaintiffs) – specifically, those underpaid royalty payments made within two years of the filing of Plaintiffs' Complaint.  Under its ongoing agreement to make regular payments to Plaintiffs, UMG allegedly failed to pay the full royalties that "otherwise would have accrued."  Contr. § 8.01.  The limitations period therefore renews with each successive underpayment.  *See Guilbert*, 480 F.3d at 150 (holding that the defendants' obligation to contribute $10,000 each year to the plaintiff's pension fund was a continuing obligation); *Orville v. Newski, Inc.*, 547 N.Y.S.2d 913, 914 (3d Dep't 1989) (finding a new breach of contract for each year that the defendant failed to make a minimum annual debt payment); *Kobayashi Ventures, LLC v. Papertech Inc.*, No. 08-cv-04450 (LAP), 2009 WL 10738379, at *4 (S.D.N.Y. Feb. 23, 2009) (noting that a contract providing for biannual royalty payments required continuing performance).  Given the Contractual Limitations Provision, however, Plaintiffs' claims are timely only with respect to the underpayments tied to royalty statements issued within two years of Plaintiffs' Complaint, that is, after January 4, 2021.  *See De*

*Hernandez v. Bank of Nova Scotia*, 908 N.Y.S.2d 45, 47 (1st Dep't 2010) (noting that recovery under the continuing violations doctrine is limited to those breaches that occurred within the limitations period).

### 2. Reasonable Time for Performance

Plaintiffs also argue that, because the contract does not specify the time for UMG to compensate the proposed Class for its Spotify stock, UMG did not breach the contract – and the limitations period did not begin to run – until after a "reasonable time." *See* Opp. at 8-10; Compl. ¶ 43.

"Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." *Guilbert*, 480 F.3d at 149. Here, however, the contract *does* specify a time for performance. As discussed above, the Accountings Section requires UMG to account for royalties paid to Plaintiffs in semiannual intervals. *See* Contr. § 8.01. Whether UMG breached the contract – either by failing to compensate Plaintiffs for their lowered royalty payments or by failing to distribute half of its Spotify stock – the Accountings Section required UMG to perform its contractual obligations, at the latest, within nine months. *See id.* Plaintiffs cannot insert a buffer of "reasonable time" into the statute of limitations period where the contract specifies a precise time for UMG's performance.

### 3. Equitable Tolling

Finally, Plaintiffs claim that equitable tolling allows them to bring their claims despite the statute of limitations. *See* Opp. at 10-15. Generally, equitable tolling is available only "in rare and exceptional circumstances," *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (alterations adopted) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)), where a party is "prevented in some extraordinary way from exercising his rights," *id.* (quoting *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996)). Under New York law,

equitable tolling applies only "when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (3d Dep't 2005)).  To establish tolling in cases of fraudulent conduct, as Plaintiffs allege here, the party seeking equitable tolling must establish: (1) that "the defendant wrongfully concealed material facts" that "prevented [the] plaintiff's discovery of the . . . claim," and (2) that the "plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2016) (quoting *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 157 (2d Cir. 2012)); *see NEM Re Receivables, LLC v. Fortress Re, Inc.*, 187 F. Supp. 3d 390, 398-99 (S.D.N.Y. 2016) (requiring due diligence and "some extraordinary circumstance" for equitable tolling (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005))).

Plaintiffs do not adequately allege either element required for equitable tolling. Nothing in Plaintiffs' complaint alleges when they discovered the facts giving rise to their claims and what actions they took to investigate UMG's conduct and enforce their rights upon discovery.  *See Rashid v. Mukasey*, 533 F.3d 127, 132 (2d Cir. 2008) (noting that "the due diligence requirement [is] a two-phase inquiry concerned with both the period of discovering [the cause of action] and the period between such discovery and filing the [complaint]"); *Doyle v. United Airlines, Inc.*, 914 F. Supp. 2d 325, 335 (E.D.N.Y. 2012) (declining to equitably toll limitations period where the plaintiff did not explain why she waited one year to file her complaint after learning that she had a cause of action).

Nor do Plaintiffs note additional conduct after UMG's alleged breach that prevented them from filing suit.  *See Marshall*, 51 F. Supp. 3d at 464-65 (rejecting equitable tolling where the plaintiffs did not allege "additional misrepresentations" that "were for the purpose

of concealing the alleged prior deceptive conduct"); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (rejecting an equitable-tolling argument where the plaintiffs "have not alleged an act of deception, separate from the ones for which they sue").  Plaintiffs argue that "UMG concealed its Spotify holdings by omitting Spotify stock from its royalty statements."  Opp. at 11; *see* Compl. ¶¶ 4, 47.  But equitable tolling in the context of fraudulent concealment requires "some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient."  *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) (quoting *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 198 (N.Y. 2007)).  A case without allegations of affirmative wrongdoing, "where the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they had committed," does not justify equitable tolling. *Corsello*, 967 N.E.2d at 1184; *see Marshall*, 51 F. Supp. 3d at 465 (declining to apply equitable tolling where the plaintiffs failed to adequately plead that the defendant "took additional actions to . . . prevent [them] from discovering the alleged defect"); *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.) (noting that the alleged wrongdoing "must be affirmative and specifically directed at preventing the plaintiff from bringing suit; failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large"), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (summary order).

Plaintiffs' reliance on *Telesco v. Neuman*, No. 14-cv-03480 (VB), 2015 WL 5474230 (S.D.N.Y. Sept. 8, 2015), is misplaced.  There, the plaintiff alleged that the defendant stated eleven different times that its fees would be a certain percentage, despite secretly charging higher fees that were not disclosed on the plaintiff's monthly statements.  *See id.* at *4.  Here, however, Plaintiffs do not allege that UMG separately lied to them about the royalties that they would receive.  The *Telesco* court also found affirmative wrongdoing from the

16

defendants' revised statements, which listed fictional joint ventures that allowed the

defendants to charge the plaintiff for inflated overhead costs and administrative expenses. *See*

*id.* at *1-2, *5.  By contrast, Plaintiffs allege only that their royalty statements failed to

account for UMG's Spotify stock.  *See* Compl. ¶¶ 38, 42.  The statements are akin to the

*original* statements in *Telesco* that were "silent about the amount plaintiff was due." *Telesco*,

2015 WL 5474230, at *5.  Plaintiffs do not note any details resembling the *revised* statements

in *Telesco*, which went "further than passive concealment" and "were akin to

misrepresentations." *Id.*  Thus, they have not alleged the affirmative misconduct required for

equitable tolling.

Therefore, the Court finds that Plaintiffs' contract claims – apart from those seeking

compensation for lowered royalty payments issued after January 4, 2021 – are time barred.[4]

## II.  Plaintiffs' Claims

Turning next to the merits of the claims, even if all of Plaintiffs' claims were timely

(which they are not), they would still fail as a matter of law.

### A.  Breach of Contract

To state a breach-of-contract claim under New York law, Plaintiffs must allege:  (1)

the formation of a contract between the parties; (2) performance by the plaintiff; (3) failure of

---

[4] The Court need not decide whether the Contractual Limitations Provision applies to Plaintiffs' unjust enrichment claim because the claim is untimely even under a six-year statute-of-limitations period.  *See Matana*, 957 F. Supp. 2d at 494 (noting that the statute of limitations for unjust enrichment claims "begins to run 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered'" (quoting *Cohen*, 711 F.3d at 364)).  Plaintiffs claim that Defendants "unlawfully retained the Spotify equity it received as part of its agreement with Spotify," which occurred in 2008.  Compl. ¶ 84.  And for the reasons discussed above, Plaintiffs' suggestion – without supporting caselaw – that the Court apply the continuing violations doctrine to their unjust enrichment claim is unavailing.  *See* Opp. at 6 n.2.

defendant to perform; and (4) damages. *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019). The only issue here is whether UMG failed to perform under the contract.

At the pleadings stage, the Court may dismiss a breach-of-contract claim only if the terms of the contract are unambiguous. *Id.* at 13. A contract is unambiguous under New York law "where the contract language has a definite and precise meaning" for which "there is no reasonable basis for a difference of opinion." *Id.* at 12 (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). Conversely, a contract is ambiguous if its language "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000)). Courts consider the ambiguity of a contract under the "normal rules of contract interpretation," according to which "words and phrases should be given their plain meaning" and the contract is "construed so as to give full meaning and effect to all of its provisions." *Orchard Hill Master Fund Ltd. v. SBA Comm'cns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (quoting *Orlander*, 802 F.3d at 295). If the contract's unambiguous language confirms as a matter of law that no breach has occurred, a court may dismiss the breach-of-contract claim. *See, e.g.*, *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 153 (S.D.N.Y. 2007).

According to Plaintiffs, UMG breached two provisions of its contract. *See* Compl. ¶ 38; Contr. §§ 7.06, 8.01. The Royalties Section requires that royalties for the "exploitation of [Plaintiffs'] Master Recordings" equal "fifty percent" of UMG's "net receipts with respect to such exploitation." Contr. § 7.06(a). The section then defines "net receipts" as "amounts received by [UMG] in connection with the subject matter thereof which are solely attributable to the Master Recordings." *Id.* § 7.06(b). Plaintiffs argue that UMG breached this section by failing to compensate Plaintiffs for the lowered royalty payments that it negotiated for Spotify

stock, or by failing to distribute their share of half of that stock.  *See* Compl. ¶ 38.  Plaintiffs also contend that UMG breached the Accountings Section's related requirement by failing to account to Plaintiffs on a semiannual basis for "royalties accruing or which otherwise would have accrued" under the Royalties Section.  Contr. § 8.01; *see* Compl. ¶ 38.

The contract's plain language does not support Plaintiffs' theories of breach. Plaintiffs' only timely claim – that UMG breached the contract by agreeing to lower royalties for which it did not compensate Plaintiffs – finds no support in the contract, which grants UMG "the sole, exclusive and unlimited right throughout the world to . . . license" Plaintiffs' works, Contr. § 5.01(a), and vests in UMG the "sole discretion" to determine "[t]he method, manner and extent of . . . distribution and exploitation of [Plaintiffs'] Master Recordings and Records," *id.* § 14.03.  Given this wide discretion, there is no basis upon which to find that UMG breached the contract by accepting a lower royalty from Spotify.  *Crowley*, 512 F. Supp. 2d at 152-53 (dismissing breach-of-contract claim where the contract's plain language did not support the plaintiffs' theory of breach).  Presumably because of this, Plaintiffs appear not to pursue their breach-of-contract claim for lowered royalties under this theory.  Instead, they cabin their breach-of-contract arguments in their opposition brief solely to the (untimely) claim that UMG breached by failing to distribute or otherwise account for its Spotify stock. *See* Opp. at 15-18.

That latter theory fails too, not only because it is time barred, but also because Plaintiffs cannot directly trace UMG's alleged acquisition of Spotify stock to the use or exploitation of their work alone.  Per the Royalties Section's definition of "net receipts," royalties are paid only if they are "solely attributable" to Plaintiffs' sound recordings.  Contr. § 7.06(b).  UMG's alleged acquisition of Spotify equity is not solely attributable or traceable to the actual exploitation of a particular artist's sound recording.  Thus, because UMG's

Spotify stock does not count as "net receipts," UMG did not breach the contract by failing to account for its value when paying Plaintiffs their royalties. *See, e.g.*, *Edwards*, 938 F.3d at 13-14 (affirming dismissal of breach-of-contract claim where unambiguous guidance incorporated by reference into the agreement showed no breach); *Orchard Hill*, 830 F.3d at 160 (same where the contract's plain language showed that the plaintiff was not entitled to interest payments underlying the claim).

Plaintiffs counter that the term "solely attributable" should be interpreted as dividing the royalties owed among all artists whose work was licensed. *See* Opp. at 16. Concluding otherwise, as Plaintiffs put it, would allow UMG to "reap infinite licensing fees from [their artists'] recordings," so long as it "licensed artists' work in bulk." *Id.* at 15. Not so. Even where UMG licenses the work of multiple artists in its catalog, Plaintiffs accrue royalties for the streaming of their music on Spotify, derived from the exploitation of their work alone. As the Complaint provides, UMG licensed to Spotify in bulk "its catalog" that included the Black Sheep recordings, Compl. ¶ 36, and Plaintiffs thereafter received royalties for the exploitation of their work when it was digitally streamed, *id.* ¶ 42 (acknowledging "various entries for Spotify royalties earned from digital streaming"). This royalty structure is consistent with the language of the contract and compensates the artist for the royalty stream that is solely attributable to the digital streaming of their music. By contrast, UMG's alleged acquisition of Spotify stock does not constitute net receipts that are solely attributable to the exploitation of Plaintiffs' work.

To bolster their interpretation, Plaintiffs rely on other parts of the Royalties Section, which do not alter the Court's construction. *See* Opp. at 16 & n.5. That the contract contemplates royalties for Master Recordings sold through record clubs, Contr. § 7.06(a)(i), under "licenses . . . on a flat-fee or other royalty basis," *id.* § 7.06(a)(iii), or for "use . . . in

motion pictures and television soundtracks," *id*. § 7.06(a)(v), tracks the plain language of the contract, by which royalties accrue for revenue that is "solely attributable" to the exploitation of Plaintiffs' work.  Meanwhile, the contract excludes royalties for "blanket licenses to exploit [UMG's] Audio-Visual Recording catalog," *id.* § 7.06(a)(iv), but that clause does not establish that the parties meant to share all net receipts from "blanket licenses of UMG's recording catalog," Opp. at 18.  As Plaintiffs' digital-streaming royalties demonstrate, *see* Compl. ¶ 42, royalties accrue only from amounts that can be traced to the exploitation of Plaintiffs' work alone, Contr. § 7.06(b).  The exclusion for blanket licenses of UMG's Audio-Visual Recording catalog adds only a narrow exception to that understanding in the context of music videos; it does not rewrite the general rule.  *See id.* (excluding from "net receipts" the "catalog and/or administrative fees payable to [UMG] for the licensing of Audio-Visual Recordings hereunder").

Plaintiffs also argue that Section 7.10 contains a "formula" for determining net receipts when UMG groups Plaintiffs' recordings with those of other artists in a license.  Opp. at 16.  They suggest that, under this section, the "solely attributable" language "does not refer to *whether* royalties are owed, but instead to *how* royalties are calculated when multiple artists' recordings are combined," such that each artist receives the pro-rated share of royalties that is "solely attributable" to their work.  *Id.* at 17.  Plaintiffs overstate the significance of Section 7.10, which requires only that, "[a]s to Records not consisting entirely of Master Recordings delivered hereunder, the royalty to be accrued hereunder shall be pro-rated on the basis of the number of Master Recordings hereunder which are on such Records compared to the total number of royalty-bearing Master Recordings on such Records."  Contr. § 7.10.  Elsewhere, the contract defines "Records" as the "device . . . on or by which sound may be recorded and reproduced."  *Id.* § 13.02.  In other words, Section 7.10 pro-rates the royalties

that accrue when recordings from various artists are included on a single Record, as might be the case, for example, with a compilation album.  That clause does not advance a contract-wide method for computing royalties for licenses "not consisting entirely" of one artist's work; instead, it creates a compilation-album-type *exception* for which the "royalty to be accrued" is pro-rated, *id.* § 7.10, as opposed to in other cases where the accruing royalty is "a sum equal to fifty percent . . . of [UMG's] net receipts" that are "solely attributable" to a particular artist or recording, *id.* § 7.06(a)-(b).  Had the parties intended to pro-rate net receipts not "solely attributable" to an artist's recording in other contexts, they could have included language to that effect – but they did not.  *See Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 306-07 (2d Cir. 2016) (noting that drafters of contracts "must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning" (alteration adopted and citation omitted)).

Because the Court finds, as a matter of law, that UMG's Spotify stock is not a "net receipt," it concludes that UMG has not breached the contract by failing to compensate or otherwise account to Plaintiffs for the value of that stock.[5]

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing

UMG argues that Plaintiffs' implied-covenant claim fails as a matter of law because: (1) the claim is duplicative of Plaintiffs' breach-of-contract claim; and (2) the claim seeks to

---

[5] UMG also challenges as unripe Plaintiffs' claim that UMG breached the contract by failing to account for and compensate Plaintiffs for the value of its Spotify stock after Spotify's IPO in 2018.  *See* Br. at 19-21.  However, as discussed above, the contract does not imply a reasonable time for performance because its Accountings Section specifies a precise time for UMG's performance.  Thus, the claim is not unripe, but it is time barred.

impose implied obligations that are inconsistent with UMG's express rights under the contract.  Br. at 2.  Plaintiffs dispute these characterizations of their covenant claim.  *See* Opp. at 18-22.  The Court declines to dismiss the covenant claim as duplicative because Plaintiffs plead it as an alternative to their breach-of-contract claim.  However, the claim is dismissed because it seeks to impose implied obligations at odds with UMG's unfettered discretion to license Plaintiffs' recordings under the contract.

### 1.  Duplication of Claims

Under New York law, a claim for violation of the implied covenant of good faith and fair dealing may be dismissed as duplicative when the claim is not "based on allegations different from those underlying the breach of contract claim."  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022).  However, "this anti-duplication rule 'does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing' alongside a claim for express breach of contract when those claims 'are brought in the alternative.'"  *Sorotzkin v. EmblemHealth Inc.*, No. 22-3194, 2023 WL 7383169, at *2 (2d Cir. Nov. 8, 2023) (summary order) (quoting *Fantozzi v. Axsys Techs., Inc.*, No. 07-cv-02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)).  "A party is only precluded from recovering on both theories at the same time."  *Id.* (alteration rejected) (quoting *Fantozzi*, 2008 WL 4866054, at *7); *see Fantozzi*, 2008 WL 4866054, at *8 (allowing plaintiffs to plead claims for breach of contract and, in the alternative, breach of the implied covenant of good faith and fair dealing).

Here, Plaintiffs bring their covenant claim in the alternative, arguing that UMG – even if it did not breach the express terms of the contract – breached the implied covenant of good faith and fair dealing "by secretly licensing its catalog to acquire an equity stake in Spotify." Compl. ¶ 81; *see id.* at 17 (pleading Count II's covenant claim "in the alternative"

(capitalization omitted)); *id.* ¶¶ 78-80.  Assuming that "the allegedly improper conduct did not breach an express contractual provision, that is precisely the circumstance in which a party may maintain a claim for breach of the implied covenant." *Sorotzkin*, 2023 WL 7383169, at *2.  UMG's cases, all concerning instances where the plaintiff brought freestanding breach-of-implied-covenant claims alongside breach-of-contract claims, do not upset this conclusion. *See Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015); *Zam & Zam Super Mkt., LLC v. Ignite Payment, LLC*, 736 F. App'x 274, 278-79 (2d Cir. 2018) (summary order); *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 520 (S.D.N.Y. 2003).  Therefore, the Court will not bar as duplicative the covenant claim, which Plaintiffs bring as an alternative to their breach-of-contract claim.  However, as set forth below, the claim is still deficient because it seeks obligations that are inconsistent with the contrast.

### 2.  Inconsistent Obligations

Under New York law, a duty of good faith and fair dealing is implied in every contract, such that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)).  "Where the contract contemplates the exercise of discretion, [the duty of good faith and fair dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Cordero v. Transamerica Annuity Serv. Corp.*, 211 N.E.3d 663, 670 (N.Y. 2023) (citation omitted).

This implied covenant, however, "does not include any term inconsistent with the terms of the contractual relationship, or create duties which are not fairly inferable from the express terms of that contract." *Kitchen Winners NY Inc. v. Rock Fintek LLC*, --- F. Supp. 3d ----, 2023 WL 2746031, at *14 (S.D.N.Y. Mar. 31, 2023) (citation omitted).  "Nor can it be

construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Id.* (quotation marks and citation omitted). "[W]here a contract allows one party to [exercise a contractual right] in its 'sole discretion' and 'for any reason whatsoever' the covenant of good faith and fair dealing cannot serve to negate that provision." *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, --- N.Y.S.3d ----, 2023 WL 6467108, at *1 (1st Dep't Oct. 5, 2023) (second alteration in original) (quoting *Transit Funding Assocs., LLC v. Cap. One Equip. Fin. Corp.*, 48 N.Y.S.3d 110, 114 (1st Dep't 2017)). "If the express terms of a contract provide for unrestricted discretion, then an implied limit on that discretion would be inconsistent with the express terms of the contract." *Yang v. Bank of N.Y. Mellon Corp.*, No. 20-cv-03179 (AJN), 2021 WL 1226661, at *10 (S.D.N.Y. Mar. 31, 2021). Moreover, the implied covenant does not "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F. 3d 807, 817 (2d Cir. 2014) (quotation marks and citation omitted).

The express language of the contract is incompatible with an implied duty restricting UMG's right to license Plaintiffs' sound recordings in the manner that it allegedly did. Under the contract, UMG has the "sole, exclusive and unlimited right" to license those works, Contr. § 5.01(a), including the "sole discretion" to determine the "method, manner and extent" of their exploitation, *id.* § 14.03. Plaintiffs argue that UMG exceeded the "bounds of its discretion" under the contract by "making an undisclosed licensing deal in exchange for Spotify stock, for which UMG is withholding artists' rightful share, whether in cash or stock, of the proceeds UMG reaped and retained for itself." Opp. at 21-22 (emphasis and internal citations omitted). But they do not square that conclusion with UMG's "unlimited right" to license their work, Contr. § 5.01(a), or its "sole discretion" to determine how their work

would be exploited, *id.* § 14.03.  Plaintiffs' assertions are inconsistent with UMG's express, broad discretion under the contract and its right to act in its self interest in purchasing equity in Spotify.  *See Leaverton v. OFI Glob. Institutional, Inc.*, No. 21-cv-05659 (LLS), 2022 WL 4133369 (S.D.N.Y. Sept. 12, 2022), at *5 (declining to adopt the plaintiff's interpretation of a clause that would "render meaningless the 'sole and absolute discretion'" given to the defendant under the contract); *19 Recordings Ltd. v. Sony Music Ent.*, 165 F. Supp. 3d 156, 164-65 (S.D.N.Y. 2016) (denying leave to amend to plead a claim for breach of implied covenant of good faith and fair dealing because licensing agreement afforded Sony "sole and absolute discretion" in licensing the songs and Sony was "acting in its own self-interest consistent with its rights under the contract" (alterations adopted)).

The Court finds nothing in the contract or UMG's conduct to implicate any implied duty of good faith and fair dealing.  *See Fishoff*, 634 F.3d at 654 (explaining that though the plan afforded the employer considerable discretion in making determinations about awards, the language of the plan placed certain limits on the employer's ability to deny payments and alter the value of awards); *Yang*, 2021 WL 1226661, at *11 (noting that the defendants did not breach any implied duty of good faith and fair dealing where they "unambiguously retained the absolute discretion" for their conduct under the operative contract).  Given the contours of the contract, Plaintiffs have not pleaded facts to support a finding that UMG acted arbitrarily or irrationally to deprive Plaintiffs of the fruits of the agreement, especially given Plaintiffs' acknowledgement that they receive royalties for Spotify's streaming of their work, *see* Compl. ¶ 42.  Therefore, Plaintiffs have not stated a claim for a violation of the implied covenant of good faith and fair dealing.

### C.  Unjust Enrichment

Moving to Plaintiffs' final claim, under New York law, an unjust-enrichment claim

has three elements:  (1) the other party was enriched; (2) at the plaintiff's expense; and (3) it is against equity and good conscience to allow the other party to retain what is sought to be recovered.  *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 312 (N.Y. 2018) (alterations adopted and citation omitted).  Unjust enrichment is a narrow doctrine, *ASG & C, Inc. v. Arch Specialty Ins. Co.*, 2022 WL 839805, at *1 (2d Cir. Mar. 22, 2022) (summary order), "available only in unusual situations when, though the defendant has neither breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," *id.* (alteration adopted) (quoting *Corsello*, 967 N.E.2d at 1185).  In certain circumstances, plaintiffs may plead alternative causes of action for breach of contract and unjust enrichment, but "only where there is a dispute over the existence, scope, or enforceability of the putative contract."  *Grossman v. GEICO Cas. Co.*, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022) (citation omitted).

However, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [under a theory of unjust enrichment] . . . for events arising out of the same subject matter."  *ASG & C, Inc.*, 2022 WL 839805, at *1 (alterations in original) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)); *see Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (noting that unjust enrichment, as a quasi-contract claim under New York law, "is an obligation the law creates in the absence of any agreement" (citation omitted)); *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (summary order) ("Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as . . . unjust enrichment . . . are generally precluded, unless based on a duty independent of the contract.").

Here, the parties have a valid and enforceable contract that governs the subject matter of this dispute, that is, UMG's obligations as to the payment and accounting of royalties to Plaintiffs.  *See* Compl. ¶ 65 (noting that "Plaintiffs . . . entered into valid contracts with Defendant"), ¶ 75 (same), ¶¶ 83-86 (grounding Plaintiffs' unjust-enrichment claim on underpaid royalties).  Therefore, Plaintiffs are "limited to recovery on the contract and may not seek recovery based on an alleged quasi contract."  *ASG & C, Inc.*, 2022 WL 839805, at *1; *see Grossman*, 2022 WL 1656593, at *3 (affirming dismissal of unjust-enrichment claim pleaded in the alternative where the parties did not dispute that there was an express, valid, and enforceable contract governing the subject matter of their dispute).

Plaintiffs' reliance on an unpublished Second Circuit summary order, *Axon v. Citrus World, Inc.*, 813 F. App'x 701 (2d Cir. 2020) is misplaced.  While the court in *Axon* acknowledged that the plaintiff could "plead unjust enrichment in the alternative to a breach of warranty claim," there was "doubt as to the existence of the warranty."  *Id.* at 706.  Here, no party disputes that there is an express, valid, and enforceable contract and that Plaintiffs' claims fall squarely within the scope of the parties' valid contract.  *See* Compl. ¶ 84 (alleging unjust enrichment because Plaintiffs "have been paid less than 50% of net receipts" from UMG's exploitation of their recordings under the contract); *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-02048 (ER), 2017 WL 1134765, at *6 (S.D.N.Y. Mar. 23, 2017) (dismissing unjust-enrichment claim where "both parties assert the [contract] is valid and enforceable and agree that the [disputed issue] is governed by the express terms of the [contract]").  Because the parties' contract covers the entirety of their dispute, it precludes Plaintiffs from asserting their unjust-enrichment claim.

## III.   Leave to Amend

Rule 15(a) provides that courts "should freely give leave [to amend] when justice so

requires."  Nonetheless, "it is within the sound discretion of the district court to grant or deny

leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun &*

*Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "[A] district court may properly deny

leave when amendment would be futile."  *Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166

F.3d 45, 50 (2d Cir. 1998).  To seek leave to amend, a plaintiff should "provide some

indication of the substance of the contemplated amendment before a court could entertain the

request."  *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 624 (S.D.N.Y.

2014); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff

need not be given leave to amend if it fails to specify . . . how amendment would cure the

pleading deficiencies in its complaint.").

      Here, Plaintiffs seek leave to amend in their opposition.  *See, e.g.*, Opp. at 11 n.3, 25.

However, Plaintiffs indicate only that they would amend the Complaint to supplement their

equitable tolling argument, "add[ing] allegations regarding when they discovered UMG's

conduct at issue and the actions they took following that discovery."  *Id.* at 11 n.3.  As

discussed above, new allegations sufficient to establish Plaintiffs' due diligence would not,

alone, establish equitable tolling or otherwise salvage the untimeliness of their claims.  More

importantly, though, it would not rescue their claims on the merits.

      Considering the reasons for dismissal set forth above, the Court finds that leave to

amend is not warranted because it would be futile.  *See, e.g.*, *Jones*, 166 F.3d at 50 (affirming

denial of leave to amend "because Jones may not seek damages based on injuries suffered

incident to service in the Guard, [so] Jones's proposed amended complaint would be subject

to immediate dismissal"); *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510

(S.D.N.Y. 2015) (noting that "better pleading will not cure the defect" in denying leave to

amend time-barred claims (quotation marks and citation omitted)).

**CONCLUSION**

For the foregoing reasons, UMG's motion is GRANTED.  The Class Action

Complaint is dismissed and Plaintiffs' alternative request for leave to amend is DENIED.  The

Clerk of Court is respectfully directed to CLOSE the case.


Dated:  November 20, 2023
         New York, New York

SO ORDERED.

_Jennifer Rochon_____

JENNIFER L. ROCHON
United States District Judge